UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 Cr. 618 (JPC)

CHRISTOPHER BURGOS, ET AL.,

Defendants. Hearing

------------------------------x

New York, N.Y.
January 5, 2023
2:00 p.m.

Before:

HON. JOHN PETER CRONAN,

U.S. District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
THOMAS SOMERSET BURNETT
Assistant United States Attorney

JEREMY M. IANDOLO
Attorney for Defendant Christopher Burgos.

MICHAEL KRAUT
Attorney for Defendant Surinder Singh Cheema.

PHILIP L. REIZENSTEIN
Attorney for Defendant Michael Gian William Habib.

JACOB MITCHELL
VICTOR SHERMAN
Attorney for Defendant Bhupinder Singh Virk.

(Case called)

THE COURT: Can counsel, starting with the government, please state your appearance.

MR. BURNETT: Good afternoon, your Honor. Thomas Burnett for the government.

THE COURT: Good afternoon, Mr. Burnett.

MR. SHERMAN: Good afternoon, your Honor. Victor Sherman appearing for Mr. Virk.

Mr. Virk speaks English sufficiently, your Honor, that I'm prepared to go ahead. I've indicated to your clerk in the future when things become more complicated we would like a Punjabi interpreter, but I've had enough conversations with him in English that I'm satisfied for purposes of today's hearing he understands English sufficiently to be able to proceed today.

THE COURT: Okay. Good afternoon, Mr. Sherman.

Mr. Virk, is that right? Are you comfortable proceeding today in English?

DEFENDANT BHUPINDER SINGH VIRK: Yes, sir.

MR. SHERMAN: Also, I have co-counsel Jacob Mitchell present here in court.

THE COURT: Good afternoon, Mr. Mitchell.

MR. MITCHELL: Good afternoon, your Honor.

MR. REIZENSTEIN: Good afternoon, your Honor. Michael Reizenstein on behalf of Mr. Habib, who's present.

THE COURT: Good afternoon, Mr. Reizenstein.

MR. KRAUT: Good afternoon, your Honor. Michael Kraut for Surinder Singh Cheema, sitting in the middle. And there are some issues about bond we'd like to discuss with the Court later.

THE COURT: Yes. Good afternoon.

MR. IANDOLO: Good afternoon, your Honor. Jeremy Iandolo for Christopher Burgos, seated to my right.

THE COURT: Good afternoon, Mr. Iandolo and Mr. Burgos.

So we're here for a pretrial conference. I previously had an appearance for Mr. Burgos when he was arraigned on December 1st, 2022. Since then of course the other three defendants have arrived in this district.

Let me just confirm the status of those defendants. My understanding is that Mr. Habib, Mr. Virk, and Mr. Cheema were all presented and arraigned on December 22nd; is that right?

MR. BURNETT: That's correct, your Honor.

THE COURT: At that appearance -- appearances I should say, Mr. Habib and Mr. Virk both were detained without prejudice to future bail application; is that right?

MR. BURNETT: That's correct. That's right.

THE COURT: Mr. Sherman, does Mr. Virk intend to make a bail application today?

MR. SHERMAN: That is correct, your Honor.

THE COURT: We'll deal with that at the end of the proceeding.

MR. SHERMAN: Thank you.

THE COURT: Mr. Cheema was granted or at least a bail package was approved by Judge Gorenstein with various conditions. I take it those conditions obviously have not been met.

MR. KRAUT: We are actually at the finalization of that. One issue needs to be addressed with the Court today.

THE COURT: Well, I guess there are two issues.

Does the government still intend to appeal that decision?

MR. BURNETT: Yes, your Honor.

THE COURT: So at the conclusion of the conference, we'll address I guess both the appeal for Mr. Cheema and the bail application for Mr. Virk. I assume the parties agree that my review of Judge Gorenstein's decision would be de novo, so it's the same review I'd be doing for both defendants.

Is that your understanding, too?

MR. BURNETT: Yes, your Honor.

THE COURT: Thank you.

MR. KRAUT: Yes, your Honor.

THE COURT: Great.

So let me go back to Mr. Burnett. I know he did --

maybe it was Mr. Shahabian on December 1st, but I was hoping to get an overview of the allegations in this case. There are four indictments that charge the same counts to each defendant, but, in particular, what the conduct alleged is in this case, as well as the materials, both in terms of volume and categories of discovery the government anticipates producing.

MR. BURNETT: Of course, your Honor. As to allegations, I'll give an overview now and go into detail when we do the bail arguments.

In broad strokes, the government alleges that all of the defendants are part of a large-scale drug trafficking organization that operates principally in the United States and Canada. The specific shipments of drugs that are at issue in the complaint are a series of cocaine deliveries that were made to a warehouse in New Jersey between March 18 and March 21st of 2022. Over that roughly three-day period, there were approximately 400 kilograms of cocaine that were delivered to a warehouse, and they were supposed to be packaged, uploaded onto a truck, and shipped elsewhere, but those drugs were ultimately seized.

The evidence against the defendants in this case consists of principally law enforcement reports and confidential -- basically, recordings of both conversations and text messages that were gathered by law enforcement through a confidential source. That's one category of materials. The

other large category of materials is search warrant returns. The search warrant returns are principally location data from pen and ping warrants, iCloud data that was obtained from Apple, and then following the -- or in connection with the arrest of the defendants, in various stops made of other people involved in the operation, the government's gathered a number of electronic devices, principally cell phones, so as to those as well.

THE COURT: What is the status of the production?

MR. BURNETT: So right now, just talking with defense counsel, the government has ready to go nearly all of the material that was gathered during the pre-arrest phase of the case. The government's going to ask defense counsel to send over basically 125 gigabyte hard drives each, and we'll be able to get those materials out.

The materials that are outstanding are a handful of law enforcement reports, which I'm -- which we'll be able to get promptly. There is an extraction from one of Mr. Virk's devices and an extraction from one of Mr. Habib's devices that I understand are en route to the Southern District of New York, so I'll be able to produce those promptly.

Then there were other devices seized from Mr. Virk, Mr. Cheema, and Mr. Habib in connection with their arrest. My understanding is the initial attempts to access the data to those devices weren't successful, and, basically, they're

waiting on a software upgrade to see if they can get in. So there's not really a good time line of when that will happen, if ever.

THE COURT: In terms of discovery for Mr. Burgos, has that been produced?

MR. BURNETT: So I was planning to produce it in conjunction with everyone else.

THE COURT: Let me ask counsel, any concerns with that discovery plan?

MR. SHERMAN: Yes, your Honor. Victor Sherman.

We've talked among ourselves, and is this an appropriate time to suggest another date, to give us time to review all that discovery and have another pretrial conference at which time we would set a motion hearing time?

THE COURT: I think that would make sense. How much time --

MR. SHERMAN: We're talking about 90 days. So we picked a date. Again, I'm not sure what day of the week the Court hears things, but we understand there's no particular day, so if we could pick a Friday, we've all agreed April 28, which is good for all of the defense counsel. Three of us are from out of the state. And I've spoken to Mr. Burnett, and he's agreed that that would be a good date for the government. And it is a Friday, which makes it easier on out-of-state counsel.

THE COURT: One moment.

MR. SHERMAN: And I don't know if the Court likes morning or afternoon. Probably, again, if we could do it in the morning, it might be best.

THE COURT: Yes. Friday the 28th works fine on my schedule.

Mr. Burnett, does that work for the government?

MR. BURNETT: Yes, your Honor.

THE COURT: Okay. I may have a trial going on at that time. I'm not sure. So why don't we do 9:30 a.m. on the 28th.

Does that work for everyone?

MR. BURNETT: Yes, your Honor.

MR. REIZENSTEIN: Judge.

THE COURT: Yes?

MR. REIZENSTEIN: I think I may have heard you misspeak and say Friday, May 28.

THE COURT: If I did, I meant April 28.

MR. REIZENSTEIN: And that works.

MR. SHERMAN: I think that's good for all defense counsel then, your Honor.

THE COURT: Great. So we'll have our next conference April 28 at 9:30. It appears everybody is in agreement with that plan. It will give sufficient time for counsel and defendants to review discovery. I expect we'll set a motion schedule on that date and probably a trial date as well,

depending on where things stand. If a disposition is reached with any of the defendants before that date, just reach out to Ms. Henrich and we'll schedule an appropriate proceeding.

On the topic of discovery and the government's disclosure obligations, let me also mention something I mentioned on December 1st with Mr. Burgos and that it appears Judge Gorenstein may have also addressed at the arraignments, but to be safe, let me put it on the record as well. In late October 2020, the Due Process Protections Act went into law. That statute has provisions that amend Rule 5 of the Federal Rules of Criminal Procedure such that Rule 5(f) now requires me to remind the parties of the prosecutor's obligations under the Supreme Court decision in *Brady v. Maryland*.

Pursuant to that statute and Rule 5(f) I direct the prosecution to comply with its obligations under *Brady v. Maryland*, and that case's progeny, to disclose to the defense all information, whether admissible or not, that is favorable to the defendant, material either to guilt or punishment, and known to the prosecution. Possible consequences for noncompliance may include dismissal of individual charges or the entire case, the exclusion of evidence, and professional discipline or court sanctions on the attorney or attorneys responsible.

On December 1st, I also issued a written order to that effect in connection with Mr. Burgos' case. I believe Judge

Gorenstein issued similar orders to Mr. Virk and Mr. Habib. I haven't seen an order to Mr. Cheema, so to be safe I'll probably enter an order after this case covering all defendants.

But let me just confirm with Mr. Burnett that the government understands its obligations and will comply with them.

MR. BURNETT: Yes, your Honor.

THE COURT: Thank you.

We also had mentioned something else I advised Mr. Burgos about on December 1st, and I'll mention it to Mr. Habib, Mr. Cheema, and Mr. Virk. This is something I tell defendants also at their first appearance before me. It's nothing unique to any of you, or certainly not to your attorneys, but if circumstances arise that you want or need to change counsel, maybe you want to retain a different attorney, maybe you cannot afford an attorney and need one appointed, it's very important that you raise that as soon as possible.

You've heard Mr. Burnett mention the discovery in this case. It takes time for the attorney to review that discovery and prepare for trial, and at some point, maybe at the next conference, I'll be setting a trial date. That date is unlikely to change, so I'll tell you that if you do have an application to change counsel, it's in your interest to do that sooner rather than later, because if you wait too close to the

trial date, you may be left with the choice of proceeding with your existing counsel or proceeding without counsel. But, again, that's something I always tell defendants at their first appearance before me.

Before we turn to the bail issues, is there an application from the government?

MR. BURNETT: Yes. The government moves to exclude time under the Speedy Trial Act until the next conference, which is April 28. That's in the interest of justice, so that the parties can produce and review discovery, discuss potential pretrial resolutions to the case, or prepare for motion practice.

THE COURT: Mr. Sherman?

MR. SHERMAN: No objection, your Honor.

THE COURT: Mr. Reizenstein?

MR. REIZENSTEIN: No objection.

THE COURT: Mr. Kraut?

MR. KRAUT: No objection.

THE COURT: Mr. Iandolo?

MR. IANDOLO: No objection.

THE COURT: I'll exclude time from today until April 28, 2023, pursuant to Title 18, United States Code Section 3161(h)(7)(A). I find the ends of justice served by excluding such time outweigh the interests of the public and the defendant in a speedy trial, and those are for the reasons

that Mr. Burnett mentioned: To allow the government to produce discovery, to allow the defense to review that discovery and consider any motions, and for the parties to discuss any disposition of this case.

Are there any other matters we should address before we turn to the bail issues?

MR. BURNETT: Not from the government's perspective.

MR. SHERMAN: No, your Honor.

MR. REIZENSTEIN: Not on behalf of Mr. Habib.

MR. KRAUT: On behalf of Mr. Cheema, just for clarification, is any of this under seal at this point or no longer, so we all make sure our filings are correct.

THE COURT: I don't think anything has been under seal so far. Has there been anything?

MR. BURNETT: The indictment was originally under seal, but nothing since then.

MR. KRAUT: Okay. Thank you.

MR. IANDOLO: Nothing for Mr. Burgos.

THE COURT: If there comes a need for -- obviously if anything we discuss today has to be under seal, I'll handle that. As appropriate, if there are sealed filings that the parties want to make, we have a rule and procedure how to do that which is available on the Court's website.

So given that, I think it probably makes sense to start with the government here. Given that it's for one

defendant, Mr. Cheema's appeal of the bail determination, and for Mr. Virk this would be the first argument I believe on bail. Is that right? Although I guess there is the count in California --

MR. BURNETT: The count --

THE COURT: So, Mr. Burnett, do you wish to be heard?

MR. BURNETT: Yes, your Honor.

So would you like to have the full argument as to Mr. Cheema and decision and then Mr. Virk, or how would you like to handle it?

THE COURT: I probably will decide both together.

MR. BURNETT: Okay.

THE COURT: So why don't I hear from you first as to -- well, either of the two defendants you want to start with, and then I can hear from the counsel. To the extent there are arguments that apply to both, you don't need to reiterate them.

MR. BURNETT: I'll start with Mr. Virk, because it's on top of my page, for no other reason.

THE COURT: Sure.

MR. BURNETT: First, a little more detail of what the scheme was here. So, as I mentioned, between March 18 -- the government or law enforcement officers were working with a confidential source that had ties to a drug trafficking organization in the United States and Canada. Through that source, the officers learned that there were going to be

shipments of large amounts of cocaine coming into a warehouse in New Jersey between March 18 and March 21st. And, basically, what the law enforcement officers did was this. They would go to the warehouse on the days when the shipments were supposed to arrive. They would monitor those shipments arriving. When the shipments would arrive, they would seize the drugs that were in there, they would repackage boxes with sham cocaine, and then have those boxes placed back in the warehouse.

Over the course of the three-day period, they seized about 400 kilograms of cocaine. And that brought us up to March 21. After the last shipment came in on March 21, another truck arrived. That truck was supposed to be the truck going to pick up all the drugs that had gathered at the warehouse and take them elsewhere, so the officers observed the driver of that truck load up the back of the truck with all the sham cocaine boxes. And then with the assistance of the local police, they stopped that truck after it drove some distance away, and seized or -- basically just sham cocaine boxes.

Now, what was important is that law enforcement, while all these shipments were coming in, were simultaneously monitoring communications between members of the conspiracy, including the co-conspirators who were charged here. And basically the way they were doing that is the confidential source who they were working with had access to an encrypted messaging application called Signal.

Signal, in addition to appearing on the user's phone, can basically be set up to mirror another person's device or computer, so law enforcement were able to both see the confidential source's device and monitor messages as they were coming in on Signal. And, basically, the tenor of the message was every time there was going to be packages arriving, the Signal chat would light up with communications saying another shipment is coming in, information about the anticipated time that it was going to arrive, when the shipment would arrive. There would be chatter about how the packages were getting unloaded, where they were going to be stored.

On March 18 at least in particular there were also communications about the quantities involved that were arriving, and then there was talk about when the next shipment would be coming in. Now, the tenor of all these conversations changed pretty dramatically when the truck that was carrying the 400 kilograms of cocaine was seized. At that point the co-conspirator realized it and effectively started panicking and pointing fingers at one another about who was responsible for getting the load seized, which included some veiled threats being made to one another on the messages.

So that's basically the heart of the evidence in the case for the actual seizures. Now, the question is, how do you tie the defendants to these messages? Signal doesn't have a name associated with the actual message sender. Instead, it

has a phone number and either an emoji or screen name. So what the government did was it used those phone numbers and screen names to work backwards and identify who the users of those phones were.

So focusing first on Mr. Virk now, Mr. Virk was someone who was using the screen name Joker and a particular phone number associated with that screen name. The government knows that Mr. Virk is the user of that phone number for a few reasons. So, first, that phone number was registered as the verified account for an iCloud account, and that iCloud account had photos of Mr. Virk and excerpts from the chats.

Second, location data for that phone number consistently hit on a residence where Mr. Virk was staying and where he ultimately was arrested from.

Third, during the chats, after the co-conspirators started accusing one another, one of the other co-conspirators sent a photograph of Mr. Virk's license, driver's license, and Mr. Virk reacted negatively to that being posted.

And, finally, Mr. Virk's Facebook picture for a while was the Joker from Batman with Keith Ledger's image.

Now, Mr. Virk played a significant role in coordinating the shipments across the country. Basically, he was clearly in communication with either the drivers of the trucks or whoever was directing the drivers of the trucks, because his messages were principally the ones that were

alerting people when there would be new shipments arriving in New Jersey and coordinating logistics for the arrival of those shipments. And, in fact, one of the group chats that these messages were taking place on was also called "joker bus," which seems to be a reference to joker and the truck coming in.

Mr. Virk also reacted very strongly when the truck was ultimately stopped by law enforcement, accusing other co-conspirators of causing a seizure. And at one point after someone sent that driver's license picture, he said "tell your family to be safe" to that person, which is kind of the veiled threat I referred to.

So there is very strong evidence that Mr. Virk was involved in coordinating this large scale narcotics trafficking operation. Now, that's important because the government believes that Mr. Virk is a serious flight risk, and that's the primary basis for detention against him, although the government also believes that he's a danger to the community and could be detained on that ground.

Now, there was a presumption case, and I'll take the arguments one at a time. So, first, with respect to risk of flight, Mr. Virk is not a citizen of the United States. He's a citizen of India. I believe he has some lawful status here, but not citizenship. And I understand from the bail reports that he continues to have significant ties abroad, including in India, which gives him a location to flee to and also gives him

a reasonably strong incentive to flee the country now, because if he is convicted of a felony, not only will he face significant jail time, he will also face a highly likely chance of being deported anyway, which gives the incentive to leave now rather than wait, go through jail, and get deported anyway.

Now, Mr. Virk also has -- the ties that he has identified as having to the United States have sort of shifted over the course of the bail arguments, which also makes the government skeptical of ties to the community here. First, in California, Mr. Virk had put forward the argument that he was engaged to someone who was here in the United States, which was part of his ties to the country. An updated addendum to the report now says he's not engaged to that person.

Similarly, Mr. Virk, when proposing where he was going to live after his -- if he were to be released, identified the residence as belonging to someone who he first called his brother, then called his cousin, and then the wife of that person when she was interviewed said it was actually someone he met when he was in ICE detention in 2016. So we think there's some reasonable amount of deception that's going on about Mr. Virk's ties to the United States and what his plans are if he is released, which is another reason he's a risk of flight.

Finally, our concern is he also has the means to flee, and the means argument dovetails with the dangerousness argument, so I'll treat them together. When Mr. Virk was

arrested on November 16, basically what happened is this: The law enforcement officers were outside of his residence for a while. They observed him drive out of the residence in a car. They stopped that car.

Inside the car when they arrested him they found a ghost gun that was on the floorboard of the passenger side -- driver's seat, and they also found a package of what looked to be a kilogram, wrapped package of narcotics, that didn't test positive for cocaine. We don't have lab reports back right now. I think the agent's suspicion was that it was some type of opiate, but we don't know.

In any event, there was the gun, the drugs, and $8,000 in cash. There was then a search warrant executed on Mr. Virk's residence, and in a bathroom that was connected to Mr. Virk's room, law enforcement officers found two additional ghost guns, two high-capacity magazines, and $475,000 in cash.

Now, that's significant for a few reasons. First, the fact that Mr. Virk has access to such significant amounts of cash raises a real concern for the government that what we seized was not all of it and that he'll have the means to flee elsewhere, so that's the means argument.

And as to danger, the fact that Mr. Virk seems to have been in possession of three unregistered ghost guns while he was dealing significant quantities of drugs raises a real concern that he has access to firearms, particularly firearms

that aren't traceable and that he can't lawfully have.

THE COURT: When you say ghost guns, these are guns that can be assembled and is not registered or otherwise --

MR. BURNETT: That's correct.

THE COURT: Is that right?

MR. BURNETT: That's right.

So that is the government's position on detention for Mr. Virk. I can either have Mr. Virk's counsel respond now or go on to Mr. Cheema.

THE COURT: Why don't we hear Mr. Virk's counsel now.

Mr. Sherman.

MR. SHERMAN: Yes, your Honor. Thank you very much.

First of all, I think it very important -- the government talks about Mr. Virk being a flight risk and a danger to the community. Let's talk about the flight risk first.

As the prosecutor indicated, the seizure took place in March of 2022. The arrest did not happen until November of '22, which was some nine months after the fact. At the same time, the prosecutor admits that the alleged co-conspirators knew about the seizure in March and obviously were presumably upset about the seizure. And yet, during that nine-month period since Mr. Virk presumably would have known about the seizure of the drugs and that the government was involved and probably an informant, but certainly law enforcement was

involved, he did nothing to flee the United States or abscond in any way, although he had obvious knowledge.

At the same time, one could argue that if he was such a flight risk, why did the government wait nine months between March and November to arrest him, either because he's a flight risk or danger to the community. If he was a danger in March, yet again, they waited nine months before doing anything. So they could not have considered him such a danger that they would leave him in the community for that period of time, and if he was such a flight risk, that they would leave him in the community for that same period of time.

Also, he did not change his residence during that nine-month period, did not try to get a new identity, get a new location. He stayed in the same exact apartment that he was in in March. So I think by their own actions they indicated he could not have been such a flight risk or a danger.

Now let's talk about the sureties that I have proposed. I will admit that I have been confused and have not properly presented who the persons are and the relationship that can act as sureties. That is because the way we look at things, cousins are something, and the way it's looked at in his religion, it's different.

So the truth of the matter is, and I have him present today, Kiran Kaur, who is the woman back there, and her husband, Mr. Singh, who is also back there, Ms. Kaur's mother

is the sister of Mr. Virk. So they are actually in our concept cousins. However, in their religion, if the mothers of the two individuals are sisters, like they are in this case, it is considered that their children are actually brother and sister. And, therefore -- I really found out this more recently by talking to my client today and to Ms. Kaur -- they consider themselves brother and sister, even though they are actually, the way we look at it is cousins.

And I don't know where the statement came -- I think pretrial must have misunderstood, but obviously since their mothers are sisters, it's not that they met in immigration in 2016. Obviously they've known each other their entire lives, so I don't know how that came about.

But, anyhow, Ms. Kaur's husband and -- his way of looking at it is his brother-in-law, although actually it's a cousin by way of marriage. So I think that clarifies the misimpression about who the relatives are.

Now, as far as where he would reside if the Court released him on bail, I have given the driver's license of both Ms. Kaur and her husband, but actually they live at a different address. They live at 1300 Station Drive, Avenel, New Jersey, apartment 1318. So they -- it's a three-bedroom apartment. It is very close to this district. They have a room for brother, cousin, however you want to look at it. They are prepared to put in a landline so he can be monitored by pretrial services

by way of an ankle monitor.

So there is a location in -- I assume, I'm not sure, but I assume it's in the Southern District, New Jersey, although I'm not positive. But, in any event, it's very close by. They have a room for him, and they are prepared to act as third-party sureties.

Now, in California, when we first made this application, the Court and pretrial did not like that idea, because Ms. Kaur and her husband lived in New Jersey and we were talking about bail in California, and they felt it was inappropriate to have somebody across the United States be a third-party surety for a case that at that point was in California, and that's why pretrial did not potentially approve that arrangement.

In addition Ms. Kaur and her husband are prepared to post $20,000 cash each on behalf of Mr. Virk.

Now, in addition to that, since the hearing in California, I have found two residences of people that are willing to put up their residences. One of the homes is in Noblesville, Indiana, and the other is in Franklin Square, New York. I put in a letter I sent to the Court the addresses of those two properties and the equity.

The house in Noblesville, Indiana, is owned by Jasvir Kaur, which is also the same last name as Karin Kaur, and the other one is Kirandeep Singh. That has an equity amount of a

little more than $135,000. And I provided to the Court and the prosecutor a driver's license for those two individuals. And then there's another individual, Gurinder Singh Grewal, who resides at 145 Rintin Street, Franklin Square. He has equity of $110,000.

So between those two individuals and the amount of money being put out by Ms. Kaur and her husband, plus other individuals, a Renu Tandon, who is an aunt, and then various cousins -- and I put their names in the report, so I won't bother to mention them again -- we have almost $300,000 in secured either property or cash that are being prepared to put up. So we have quite a bit of equity to guarantee their presence, and these individuals are even willing to sign appearance bonds for additional funds if the Court feels it appropriate to guarantee the presence of the defendant.

Now, the defendant is really in the United States -- he's been here since 2016, a little bit more than six years. He has no travel papers. He has not left the United States, and he has obviously significant family members that are willing to put up bail on his behalf.

The government originally believed that the kilo of whatever -- maybe it's a drug, maybe it isn't, that was found in the vehicle was cocaine, which was similar to the drug seized in this case, but it turned out not to be cocaine. So I don't think that that should be used against the defendant in

any way, because it was not a similar drug to the drug that was supposedly warehoused in this particular case.

THE COURT: You have to remind me, what was it?

MR. SHERMAN: I don't think it's been analyzed yet. I think the government believes it's some type of potential opium. I think that's what they believe. But it's definitely not cocaine.

Now, as for the involvement of the defendant, assuming for the sake -- that Mr. Burnett has accurately stated what is in the Signal calls, and assuming for the moment that they can tie it in to the defendant, all this -- he was a dispatcher for a trucking company, and they don't dispute that fact. And Mr. Kaur -- I mean Mr. Virk admitted that he was a dispatcher for a trucking company when there was the first bail hearing. And all he did in this case was presumably he was informing people at the warehouse that drivers would be arriving at a certain time. So he was acting as a dispatcher for a trucking company that he worked for at the time.

And I don't believe this shows necessarily any guilt, but, assuming for the sake of argument again that it shows his involvement, all he was doing was passing on messages that he was receiving from other individuals saying that drivers would arrive at a particular time, which certainly doesn't make him a major person in the conspiracy.

Now, the government says somehow he's high up in the

hierarchy so to speak. Well, we know from other cases that the people that are really at the top are not the ones that are doing the grunt work so to speak in the case. They use flunkies and other individuals to pass on messages, and, at most, that's what the defendant, Mr. Virk, was in this case. He was a messenger.

He was being told by other individuals that the drivers were driving across the United States, and he was being fed information, and he was telling people at the other end of the load where the load was being delivered that the drivers would appear one -- at a particular time. So I believe that at worse he's looked more like a mule rather than anybody high up in the organization, because people that are higher up in the organization are not usually out front like apparently he was in this case. He was, you know, in the front line passing on messages.

So I believe, since he has no prior record, that he would be safety valve eligible, even if he was convicted or we worked out a plea agreement in this case. So I don't believe he's looking at a mandatory minimum in this case, so I don't think the presumption necessarily applies, but -- although the charge requires a presumption. But I think the facts underlying his conduct in this case indicate that he's not a major player and, at worse, he's looking at, you know, maybe a mitigating role, maybe a safety valve, but certainly not a

mandatory minimum sentence.

So we have seven individuals that are financially responsible, that have no criminal record, that I've given the information to both the Court and the government, that are willing to sign on his behalf. He -- as I said, he lives here in the United States. Whatever happens, he's not going to leave his family and, you know, the daughter of his mother's sister in the lurch. Whatever Ms. Kaur has to sign on his behalf, she will sign. He's not going to disappoint her by putting her in the situation.

As to the guns found in the apartment, there was no drugs in the apartment, so those guns weren't there to protect any drugs. So yes, the guns were unregistered, and I'm not sure, to tell you the truth, that under the new Supreme Court decisions, that having an unregistered gun is even a crime anymore.

In fact, I've seen District Court cases since the Supreme Court decision that since it was not required to register guns back in the 1700s, that's not even a crime. So I'm not sure about the legality of the government proposing that these guns are somehow illegal.

THE COURT: Even putting aside the illegality of possessing --

MR. SHERMAN: I'm sorry?

THE COURT: Even putting aside whether it was illegal

or not, possessing three guns certainly does pose a danger to the community.

MR. SHERMAN: I agree that it's an issue, certainly, your Honor, but, again, those guns were in the apartment for nine months and the government didn't think he was such a danger that they had to do something during that period of time. So all in all -- by the way, the pretrial services in Southern District did recommend bail. So at least to the extent that your pretrial services here in the Southern District is competent and sophisticated, they interviewed Mr. Virk and decided that he was sufficiently reliable, that he was not such a bail risk that he could not be properly monitored, and the Court could put him on an ankle bracelet and impose all kinds of other conditions that would guarantee he would not flee. And of course he does have a residence for which he could go to.

So based upon all that information, your Honor, I would ask that the Court set bail for Mr. Virk.

THE COURT: Well, what about the concern that even if he's safety valve eligible, the guidelines range here likely would be very high, and he appears to have the means to flee given how much money was seized?

MR. SHERMAN: Well, let's talk about the money. First of all, I have been told where the money comes from, and it's not drug related. Now, I could make an offer of proof to your

Honor, but I don't have the physical proof which I think I can get in the near future showing where that money came from. So I don't want to make a representation to the Court that I can't back up later.

I have been told that the money comes from sales of trucks, but I don't have the documentation in front of me, so I don't want to make that representation. However, the government doesn't have any proof that that money is drug related, and obviously that's the inference that they're trying to present to your Honor, that it's drug related. But there's nothing in this case to indicate that it's drug related other than it's a large sum of cash.

The only drug incident that they have in this case is this case. They don't have any prior activity on the defendant's part to show that he was part of a drug ring at any other time. All they know is March of 2022, he presumably was part of a drug conspiracy, but they don't have an informant, they don't have any prior messages that this money that was found in his apartment came from an illegal source. I think it came from a legal source, but, again, I'm reluctant to make that representation to the Court.

However, I think it's reasonable to assume that if he was hoarding cash, they got it and they've seized it. There's -- we don't have any proof that he's got money somewhere else at any other location, and he certainly wasn't living as if he

had money at any other location or that he's spending a lot of money. He did have a Mercedes that the government has possession of, so that's another item that the government has that's worth a significant amount of money in the government's possession, which would induce him to remain and not give up on it. There's also the claim to maybe get that money back. because it's not drug related, and I don't believe the government can show it comes from drugs, so he has an incentive actually to make a claim against that money if there's a forfeiture. So far they did not file any forfeiture claim.

So, yes, a large amount of money was seized, but the government doesn't have any proof he has money at any other location, so I would say it's their burden at least to show he has other sources of funds that he could use to flee.

Thank you.

THE COURT: Mr. Burnett, before we turn to Mr. Cheema, I was hoping you could just address a couple of points. Maybe the main one being the essentially nine month or so delay, both to the extent you can get into details why was there a delay and, regardless of the reason for the delay, and why doesn't that undercut the risk of flight and other arguments.

MR. BURNETT: Sure. I'll take them one at a time, and actually, the reasons are kind of interrelated. So when the seizures happened, at that point all we had was the drugs and Signal chat that has phone numbers and no identity tied to

them, so the process of actually running down who all these people were required extensive leg work, both in terms of getting location warrants, but location warrants can have some noise in the signal, so then iCloud warrants. So there were a number of months that were built in in terms of basically getting evidence to find who these people were.

And then, secondly, there's more than one person on the Signal chat. Candidly, there's more people on the Signal chats than we've arrested in connection with this case, and we were reluctant to be in a situation where we were arresting people one person at a time, because our deep concern was that all of these people are significant flight risks, and our concern was if we arrested one, it would be a signal to the others that there was a real law enforcement operation investigation involved in trying to seize these drugs and figure out who the perpetrators were, so it would trigger their flight.

I'd also add that at the time we made these seizures back in March, we understood the drug angle that was going on, but we didn't know about the guns that Mr. Virk had until the day of his arrest. So the idea we knew Mr. Virk had a number of unregistered firearms and just let him have them is just wrong. We didn't know until he was arrested.

And the reason it doesn't go to his willingness or non-willingness to flee is tied up in the fact that they were

using fake -- or screen names basically on the Signal chats. From Mr. Virk's perspective, there was a drug load seized, but he'd been on an encrypted messaging application with all of his co-conspirators who also have a strong incentive to also avoid detection by law enforcement, and his name wasn't associated with those messages. So, sure, it was bad the drugs were seized, but he didn't know that someone, particularly federal law enforcement was going to come after him.

THE COURT: That's one of the reasons Signal is used, because people think it's not being detected.

MR. BURNETT: That's right, and it's not an application that will produce data in response to search warrants, for instance, and often deletes pretty easily.

Two other points, if I may. So, first, on this issue that he's just a dispatcher or a mule, I think that's just not credible. One of the Signal chats was called "joker bus" in a reference to the shipment that he was responsible for. He was not operating as the dispatcher for a legal trucking company and just doing his job that happened to be sending drugs to a warehouse. He was on a drug-related Signal chat directing hundreds of kilogram to be shipped to a warehouse in New Jersey.

And it's important to understand the kind of rough rule of thumb for the street value of a kilogram of cocaine is like $20,000, so he's responsible for huge sums of money, which

is not something you just get typically handed responsibility for in a drug trafficking operation.

And that brings me to the final point, which relates to the proposed package here. While I'm not in a position to comment what the various relations are, and I take Mr. Virk's counsel at his word what the relationships are here, I think the fact stands Mr. Virk does have significant ties overseas, will be sent overseas almost certainly in the event that he is convicted here, and he was seized with $475,000, which by itself would have been enough to basically cover everyone for the package he's proposing to put up. Whether or not it's drug money is sort of neither here nor there for the purposes of what his means are.

THE COURT: Do you know what drugs were recovered in the car?

MR. BURNETT: So I know it was not cocaine. We actually didn't make the implication in California it was cocaine. It's packaged like a kilogram. The agent who was involved said it was his best guest it was some type of opium product, but we haven't gotten the lab results.

THE COURT: Going back to the cash, it was 475,000 recovered from the house and 8,000 at the time of the arrest?

MR. BURNETT: Yes, 8,000 in the car with the arrest.

THE COURT: In the car.

MR. BURNETT: To give a little context, the $475,000

were in a backpack in the bathroom with the guns, which, again, we don't have direct evidence tying it to drug sales, but suspicious.

THE COURT: Yes. In terms of a guidelines calculation, it doesn't appear to me that -- maybe I should ask. Do you -- obviously this assumes that Mr. Virk would enter a guilty plea and comply with the requirements of Section 3553(f) I believe for safety valve relief. But in terms of his criminal history and use of violence or role or possession of a dangerous weapon in connection with the offense, do you see any reason why he would not be eligible for safety valve relief?

MR. BURNETT: So I think there -- so I don't want to rule anything out, because we don't have enough facts right now. I think there are two reasons we have significant concerns about whether he is safety valve eligible.

The first is one of the factors that has to be considered is whether he qualifies as an organizer, and, candidly, that's something that has to go through supervisory levels, because we are trying to standardize things. But the fact he's doing coordination creates some facts that give me pause.

The second and more important thing is Mr. Virk had a number of guns when he was arrested. We don't know exactly when he got those guns, but we think it creates a pretty strong suspicion from our perspective that he likely did have weapons

in connection with and at the time of his drug dealing. Obviously that will have to get hashed out in a safety valve proffer, but if he did, he would not be eligible.

THE COURT: In terms of the guidelines range, otherwise, it would appear to me that the volume, the amount of cocaine would be offense level 36, because we're -- you know, it's 400 kilograms. Are you aware of any other enhancements or mitigating factors at this point that would likely apply? Bearing in mind of course you may find out more information about his role that could point potentially in either direction.

MR. BURNETT: So right now the only two that come to mind do relate to the organization and possession of a firearm. Right now I don't know if we have enough facts to say those enhancements apply, but those are the ones that come in mind.

THE COURT: If you want to turn to Mr. Cheema, you may.

MR. BURNETT: Yes, your Honor.

So I won't give the whole lead up about the background of the investigation. So skipping right to how we know Mr. Cheema was one of the people in the Signal chats, Mr. Cheema was one of the people who was using a screen name that was just an emoji. For him it was two money bags, and that two money bags screen name was associated with a particular phone number that ended in 0205 I believe.

We know that he's the user of that phone number for a few pretty strong reasons. First, Mr. Cheema gave that number to customs officials when he was entering the country earlier. Second, pen and ping data for the number mirror Mr. Cheema's entry to and exit from the United States on a number of occasions. And, third, like with Mr. Virk, that 0205 number is tied to an iCloud account, and that iCloud account is filled with Mr. Virk's photographs and photographs of family members, that sort of thing. So, again, evidence of him being the person with the two money bags is very strong.

As to Mr. Virk's -- sorry, Mr. Cheema's role in the Signal chats, he had less of an active role coordinating, like Mr. Virk was coordinating the shipments. Like he didn't seem to be in communication directly with a driver, instead he seemed to be someone who was responsible for checking in on the status of various deliveries.

So when Mr. Virk would provide information about when a shipment was arriving, Mr. Cheema would often chime in to make sure there was going to be someone ready on the New Jersey side to receive the product. And consistent with this kind of keeping track of things role, at one point on March 18 he was the person who asked the rest of the group what the count was, which was then followed by a series of numbers that were getting exchanged, which roughly corresponded with the amount of cocaine that was seized from the warehouse that day. So it

seemed like he was basically keeping track of a tally of the amount of drugs that were coming in.

Separately, at the same time as there was a group message, Mr. Cheema was also talking with the confidential source on like an individual Signal chat, and on that individual Signal chat, he was emphasizing to the confidential source that if the confidential source was concerned at all about the safety of the boxes, the confidential source should move them elsewhere.

Now, that's all before the truck getting pulled over. After the truck got pulled over, he, like the others, expressed concern about the fact that the truck had been pulled over. And most of his communications about the truck being pulled over were actually kind of in the days and weeks that followed the truck being pulled over.

One of the things he did was he asked the confidential source to basically try to get the police paperwork, which is often something that drug trafficking organizations will try to do to make sure the drugs had like actually been seized by law enforcement as opposed to intercepted by other drug dealers. He also tried to arrange for people to get polygraph tests to sort of sort out who in the group was responsible for the truck being pulled over.

And, importantly, he also complained about another drug seizure, and this is like a little bit of a separate

context, but, basically, a few months before the seizures that we've been focused on, the confidential source had arranged for some drivers for the drug trafficking organization. Those drivers were pulled over in Kansas I believe, and law enforcement officers in Kansas found a car full of methamphetamine basically when they pulled the truck over and they seized those.

That seizure was fortuitous. It was not connected to our investigation. But in these messages with the confidential source, Mr. Cheema was talking about how these other drugs had gotten seized, too, and people still owed money in connection with that seizure, which shows he had some kind of continuing role in this operation and also monitoring who owes what, what's getting taken, that sort of thing. So we also think he had a pretty significant role in the operation.

Now, again, this is important because it goes to the strength of the evidence against him. Here it's also a presumption case. For Mr. Cheema, our argument's really based on risk of flight. And, respectfully, we think Judge Gorenstein was wrong about the decision he made that Mr. Cheema is eligible for bail here.

Mr. Cheema has basically no meaningful connections to the United States. He's a lifelong resident of Canada. His parents are in Canada. His brother is in Canada. He has for a long time had a business with family members in Canada. He's

married, and his wife and child are currently here in the United States with him, but my understanding is they came to the United States in September 2022 on a tourist visa, so they basically spent very little time in the United States as a family, and their ties here are limited by the duration of the tourist visa that he has.

So now the -- one of the arguments that was presented in front of Judge Gorenstein was that, well, Mr. Cheema wants to basically get a job in the United States and is training to work at a solar company. I don't think that's a particularly persuasive argument for bail, because even assuming that it's true, given the strength of the evidence, Mr. Cheema will likely be convicted of a felony. And even setting aside jail time, that felony will make him ineligible to stay in the United States and work, so he has no real incentive to stay.

The other thing that came up in connection with the bail argument before Judge Gorenstein was that Canada is a friendly country with extradition to the United States, which basically I think it shouldn't factor into the bail analysis at all. First of all, the question of bail is whether he's a risk of flight, not whether there's a chance that we could rearrest him. And, secondly, while Canada does extradite, it's a slow and resource intensive process, and there's no reason the government should have to take that risk.

I understand that Mr. Cheema put up and proposed a

fairly significant bail package. Now, the conditions -- there's still a number of conditions that need to be met for that package. We are all working expeditiously to comply with the order. There's still one property that has not been put up of the three and we're still short on officially approving a few cosigners.

What I'd say is that we have some real reservations about the package, the people who are being put up for the package for Mr. Cheema. Our obligations under the rule and under Judge Gorenstein's order is to find the properties, make sure they're posted, and make sure the people are financially responsible.

I'll say typically over the years I've been here when people are financially responsible cosigners, they have some meaningful connection to the person, even though that is not technically a requirement. A number of people who are being put up as financial responsible persons who are willing to sign have like no real relationship at all with Mr. Cheema. They like know a cousin of his, they met him once, they've had a month-long friendship with him, that sort of thing.

I'm not saying there's a basis for us denying those people, because if they're financially responsible, they're financially responsible, but we do have real reservations why these people are willing to sign on and how much Mr. Cheema really cares about them.

THE COURT: Could I ask, and I do think you've made strong arguments about risk of flight here, but Judge Gorenstein granted this bail package two weeks ago today, December 22nd.

MR. BURNETT: Uh-huh.

THE COURT: I was in the building that day. It could have been appealed to me that day. It could have been appealed to me at any point before then. If he's such a serious risk of flight, why did the government wait two weeks? He could have satisfied these conditions before today potentially.

MR. BURNETT: So we didn't think he was going to satisfy the conditions, and if we thought there was a meaningful chance of him actually satisfying them beforehand, we were going to appeal. My co-counsel on the case is on paternity leave, and I was not planning to be in the city during some of the period, so that was the reason we didn't push.

We also did have serious conversations with Mr. Cheema's counsel about doing an earlier bail appearance. Mr. Cheema's counsel was out of the country and requested it be delayed as well, and we've accommodated for the other reasons.

THE COURT: I don't recall where I saw this, but I believe the tourist visa would be expiring at some point in the next couple of months.

Is that your understanding as well?

MR. BURNETT: The pretrial services report said March 2023. I can't remember what page it's on. Yeah, it looks like it's page 3 of the original report.

THE COURT: Okay. What would happen then if he's on bail? The visa expires?

MR. BURNETT: So I assume he would be removable, but not necessarily automatically subject to removal. I haven't had anyone who I -- tried to begin removal proceedings against. Theoretically, we could get an SPBP, which would keep him in the country I think, but I don't think we would need to do that. We'd have to coordinate with ICE.

THE COURT: Okay. Thank you for that.

MR. KRAUT: Briefly, your Honor, let me address that exact issue.

THE COURT: Yes.

MR. KRAUT: I spoke to two different immigration lawyers, and I also believe Judge Gorenstein -- and don't fault me if I'm wrong. I was on a beach in Costa Rica when this conversation occurred, but sober, and the issue was from all parties that I did the research on in New York and California, is ICE, when there's a criminal case, does not enforce removability until such time as we've completed your criminal case. So that's not an issue here.

Let me address a couple of issues that I think are to the point, and I want to be as succinct as possible. We had a

very lengthy 45-minute discussion. These points were brought up. And Judge Gorenstein made it very clear that the government did not meet its burden, even that low burden that was necessary for detainment.

But I want to talk a little bit about what Judge Gorenstein did and where we are. He indicated he wanted a $2 million surety bond -- excuse me, $2 million personal recognizance or signature bond, three houses that we brought forward, and $100,000 cash wired to the clerk's office. The $100,000 has been wired. They were $20 short on the processing fee, and the additional money was wired, so the full amount is there.

The government's argument that -- and to be quite fair, Mr. Burnett has been expeditious, professional, and courteous to Mr. Cheema and myself through these proceedings, but I understand their position, which is we need to act in uniformity. And there's nothing that the government is going to be satisfied with with Mr. Cheema. So you then have to look at the law and where we are, whether or not the government wants that, him released or not.

My client was told he would have to turn over all travel documents, 100,000, three houses and the 2 million. When the government says that they don't like the relationship between the individuals who are willing to put up the money, I'm surprised at that. They are all individuals,

professionals. One's a lawyer with substantial assets within the United States. They are family friends.

The concern the government had and Judge Gorenstein, and I recognize that, is they didn't want it put up, houses, et cetera, in Canada, right. It would be harder for the government to seize should Mr. Cheema leave. So three houses were put forward. Two of them we provided the paperwork with Mr. Burnett. They haven't been signed and filed yet, because the government wanted to see what the Court's position was today.

The third one I will ask this Court to honor Judge Gorenstein's ruling, but to remove the third one. That individual is a husband and wife who are in the process of beginning a business, and that -- they can't put something on the house in which they need to have equity for that business. And so that has been the only reason that that house was not done.

But let's look at the facts here. First of all, I want to address the prior criminal aspect of a relationship to another seizure. The government is wrong when they said that the items that were seized was methamphetamines. My client was referencing the lawful movement of marijuana from California to another state, and 200 pounds of marijuana was seized. And he was upset with that, because it was a lawful transfer, but for, at the time, the federal policy about crossing state lines and

seizure of that. And so it was not methamphetamine. It was marijuana, which was a one time event.

In here, we have an individual who has no prior record. He is safety valve eligible. He is legally within the United States. And he was in the process of being trained to be involved with a solar company where one of those individuals actually has put up his house to vouch for him, because he knows how valuable Mr. Cheema will be for this business. But because of the law that my client refused to break, which is not working on a tourist visa, he could only go through the training and could not start to earn an income.

So he took the laws of the United States very seriously, even though he could have been making an income for his family. And his wife, who is in the back along with his brother, his wife is in California with their young child, I believe a 12- or 13-month girl, and his parents have been out in California for a time period.

But when they talk about Mr. Cheema's risk of flight, let's look at that. Not only do you have the nine months, et cetera, or at least six months since the incident occurred, my client was stopped entering into the United States, and rather than TSA or some other individual interviewing him, ICE asked to look at his phone. And I know that the government at the last hearing, on December 22nd, in front of Judge Gorenstein, indicated that it's done in a way to make people not suspicious

that you're looking at someone's phone. And I would say, as we all stand before a criminal court, there's not anybody who would be involved in drug transportation, conspiracy, sales, anything that doesn't get stopped and asked to open their phone and not realize that the drugs that were seized and then afterwards looking by ICE inside their phone, that they aren't a suspect. But he still availed himself of the United States and its opportunities to work in the solar industry.

He was arrested at that work location where they had been monitoring him, so they know where he was and that he was actually working at that place and not doing drug sales. And there were no weapons. There was no issues of flight. There was no issues of danger to the community.

I don't want to go over things twice, so if you'll just give me a moment, please.

The references to the Signal app are going to be very key in this, because, yes, my client was finding out information of numbers, as he was asked to do by somebody else, but only upon the seizure. And we have that evidence. It has not been turned over to the government yet.

There's an individual that starts threatening my client that my client then began to -- my client then began to find out exactly what's going on. Let me see a picture of the seizure. Because his life and his family's life was being threatened because of the seizure. My client's involvement, as

the government even said, before the seizure was on a more -- a minimal side.

So my client has the last of the -- I think two people are to be spoken to of the eight that Judge Gorenstein asked. Another one is a businessman in the midwest who has put up -- who has substantial assets in real estate investment and entrepreneurial, and has put up those funds.

And the other two houses have already been signed. We brought lawyers in in Florida and Indiana to make sure it was done to the government's satisfaction, that their interests, should Mr. Cheema leave, be perfected, so that they can get those properties. But the argument that Judge Gorenstein did not accept from the government here was that they are a friendly neighbor and they are easily accessible should he leave. And that's a different argument they're making with other defendants.

But more importantly, my client not only stands to lose his family's assets, his family's homes, his friends of his family's homes if he were to leave, but he also faces the ridicule that goes along with the dishonor of that. And my client has been working diligently with the family to get these conditions met, and they're a very -- or the package is a very large package. And that is why it's taken this long and we are at the last bit.

I would ask the Court to honor the Court's ruling and

just modify it and strike the third home, or accept a higher -- an additional amount of 50,000, so that it can be wired into the clerk's office for an additional cash bond on that.

Are there any other questions I can answer for the Court?

THE COURT: The government's main argument here is risk of flight of course, but also that Mr. Cheema lacks real ties to the U.S. They make the point that a conviction here will make those ties even weaker, because it will be unlikely that the job would be a possibility anymore.

Can you address some more of what ties there are? It seems like his ties primarily are out of this country.

MR. KRAUT: Well, the job that the family business is in, I think it's a tow truck and auto repair. And the reason my client left that is he didn't have enough of a business relationship in that, and a fall out with his brother who's managing it. And that's when he sought to come down here and develop his relationships in the solar industry.

Even if he were to be convicted, and even if he were to be deported, that solar company would be able to also have an extension into Canada. While most people right now with this temperature don't believe that they have any sun, but Canada still has solar power. And so his ability to continue to work with this company would be honored should he be removed from the country.

But the issue really is, is he either a flight risk or a risk of danger? We don't see any risk of danger. They haven't made any argument of that. And the risk of flight I believe, based upon the bail package that Judge Gorenstein set, was significant to ensure his return for each of the Court proceedings and punishment if there was any.

THE COURT: Thank you.

Let me also ask the officer whether there's anything further pretrial services would like to add. I've of course reviewed your reports. Is there anything in addition you wish to bring to my attention?

PROBATION OFFICER: No. We stick with our recommendation of release and possibly location monitoring.

THE COURT: Okay. I'm going to take a brief break now to consider the arguments, and we'll resume shortly.

I'll be back in a few minutes. Thank you.

(Recess)

THE COURT: Mr. Burnett, one other question I had which may not factor in, but venue, what the basis for venue is in this case.

MR. BURNETT: Oh, yes, your Honor. So a few. So for one, the confidential source made a number of communications to co-conspirators from New York. They're also -- Mr. Burgos and others were based in -- live in Long Island and needed to cross over to the district to get back and forth to the warehouse.

THE COURT: Okay. And --

MR. IANDOLO: Excuse me. May I clarify?

THE COURT: Go ahead.

MR. IANDOLO: Mr. Burgos does not live in Long Island. He lives in Brooklyn.

MR. BURNETT: I apologize.

THE COURT: These Signal chats were obtained through the confidential source I believe; is that right?

MR. BURNETT: That's right.

THE COURT: So I will state my decision on the two bail applications.

Again, first, this is an application from Mr. Virk for release on bail pursuant to conditions that were set forth by Mr. Sherman in a letter sent to me; and, second, an appeal by the government to the bail package set by Judge Gorenstein as to Mr. Cheema.

I will start with the relevant standards under the Bail Reform Act in determining whether a defendant should be released on conditions pending trial. The question is whether there is a combination of conditions or a condition that will reasonably assure the appearance of the person that's required -- or appearance of the person as required, and the safety of any person other than the defendant, and the safety of the community.

Under the Bail Reform Act, I must impose the least

restrictive condition or combination of conditions that would reasonably assure the appearance of the defendant as required and the safety of any other person and of the community. This analysis considers factors that include the nature and circumstances of the offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. And in reaching my determination as to both Mr. Cheema and Mr. Virk, I have considered all of those factors.

In addition, Section 3142(e)(3) provides for a rebuttable presumption when a judicial officer finds there to be probable cause that the defendant committed certain charged offenses. Among those charged offenses are or is an offense for which the maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act.

The defendants in this case are charged with such an offense in Count 1 of the indictment, which charges each defendant with violating Title 21, United States Code Section 846, distributing and possessing with the intent to -- by conspiring I should say to distribute and to possess with the intent to distribute five kilograms and more of mixtures and substances containing a detectable amount of cocaine in violation of Section 841(b)(1)(A).

And under Section 3142(e)(3), subject to rebuttal, it should be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. And while all the defendants in this case are innocent until proven guilty and they remain presumed innocent unless and until the government proves their guilt beyond a reasonable doubt, or they plead guilty, I find there to be probable cause that each of the defendants committed the crime charged in violation of Section 846 in light of the grand jury's finding of probable cause reflected in the return of the indictments. So the presumption under Section 3142(e)(3) is triggered.

The government primarily seeks detention on risk of flight grounds. I do pause to note, though, that I do think there is a strong argument for detention on danger to the community grounds, particularly as to Mr. Virk.

The alleged conduct in this case involved a very serious drug trafficking offense. The government alleges that the defendant participated in a drug trafficking organization that shipped over 400 kilograms of cocaine to New Jersey last year. That is a massive amount of cocaine. 1/80th of that amount would trigger the ten-year mandatory minimum under Section 841(b)(1)(A).

The trafficking in our country of deadly illegal drugs like cocaine causes a tremendous amount of harm to society, and

certainly poses a very real danger.

With respect to Mr. Virk, the government has proffered that he was in possession of a ghost gun at the time of his arrest, and two other ghost guns were found at the location where he was residing, along with a considerable amount of ammunition. A ghost gun is essentially an unregistered and untraceable firearm that can be assembled.

But with all that said, I will focus on the risk of flight analysis. For both Mr. Cheema and Mr. Virk, the government has proffered a very strong case for which each defendant would face extremely high sentencing exposure. The mandatory minimum for the charged offense is ten years, and based on the amount of cocaine at issue, about 400 kilograms, the advisory guidelines range could be much higher than that.

That amount of cocaine would trigger an offense level of 36 under Guideline Section 2D1.1(c)(2). Even assuming both defendants are in criminal history category 1, the range would be 188 to 235 months in prison.

Now, perhaps if defendants plead guilty and are eligible for safety valve relief, which is entirely speculative at this stage, but assuming that to be the case, it would bring the offense level down to 31. The range would still be very high, 108 to 135 months' imprisonment.

Given the proffered role of each defendant, with Mr. Virk apparently having contact with the driver and

communicating to others as to the status of the shipments, and Mr. Cheema checking in on the status of the deliveries and making sure that someone was around to receive them, as well as taking security measures after the seizure, it would not seem to me that either defendant likely would be eligible for a role reduction. These roles, as proffered by the government, were integral to the success of the operation. Again, an operation that involved allegedly the cross-country shipment of a huge amount of cocaine.

The strength of the government's proof coupled with the high sentencing exposure certainly creates an incentive to flee.

Now, I note that while I understand defense counsel's argument that the delay between the seizure and the arrest could cut against showing a risk of flight, I do not find that to be the case here. As proffered by the government, the defendants were communicating over an encrypted app using screen names that did not reveal their identities.

In terms of the delay on the part of the government, it's understandable why it would take some time to identify who was on those communications, but I think more important for the analysis here is the fact that the defendants did not flee over that nine-month or so period. I don't think the fact that they did not flee during that period shows that they are not a risk of flight now.

The government apparently was only able to view those communications because, unbeknownst to the other participants, one of the people on the chats was a confidential source who was providing them, those chats to the government. So even when the drugs were seized, it would have been reasonable for the participants on those Signal chats to have thought that they had not been compromised.

In addition to this, incentive to flee, each defendant whose bail I'm considering now has strong foreign ties. Mr. Cheema is a citizen of Canada. He first arrived in the United States about three months ago, in September of 2022, on a tourist visa. It appears that visa will expire in March.

His primary tie to the United States is that he wishes to remain in the country to work in the solar industry, and he has support of friends and relatives in the United States. Those foreign ties that he has and presumably, therefore, an ability to return to another foreign country, where he was not too long ago, further increases the risk of flight presented here.

And as for his incentive to remain in the United States because he hopes to secure employment here, that incentive decreases on account of the strength of the evidence that the government has proffered, which is significant to the analysis, because it increases the possibility of a conviction, in which case work in the United States would seem to be

extremely unlikely.

I therefore find, with respect first to Mr. Cheema, that the government has shown by a preponderance of the evidence that no combination of conditions will reasonably assure Mr. Cheema's appearance, so I will vacate the bail determination that was previously made by Judge Gorenstein and order his detention, continued detention.

Turning back to Mr. Virk, according to the government Mr. Virk is a citizen of India. While apparently lawfully in the United States, he is not an U.S. citizen. There is also a strong indication that Mr. Virk would have the means to flee given the considerable amount of cash that was recovered from him. $8,000 was recovered from his car at the time of his arrest, and nearly half a million dollars was recovered from where he was residing.

Again, those foreign ties Mr. Virk has and presumably the means and ability to relocate to another country halfway across the globe further increases the risk of flight presented here, and that's, again, particularly the case given the strength of the evidence proffered by the government and the high sentencing exposure.

I therefore find that the government also has sustained its burden by showing by a preponderance of the evidence that Mr. Virk is a flight risk, and that no combination of conditions will reasonably assure his

appearance.

In reaching these conclusions, I've considered less restrictive alternatives to detention. In particular, I've considered the very substantial bail package set by Judge Gorenstein as to Mr. Cheema, and I've considered the very considerable bail package proposed by Mr. Sherman for Mr. Virk, but for the reasons I've stated, I find that no alternative for detention would reasonably assure the appearance of Mr. Virk or Mr. Cheema.

So that concludes my ruling on the bail decisions.

Are there any other matters we should take up this afternoon?

MR. KRAUT: One matter, your Honor.

We had deposited $100,000 in two wires. I believe one gave credit for that 99,980, and then an additional wire yesterday was made for 40. So I would ask for a court order that I am to provide the wire instructions to the department that reached out to me yesterday, and that that within one week be wired back to the party.

THE COURT: Provide us with a proposed order just to make sure we get the language correct, or do you have particular language in mind? It shouldn't be a problem, but I want to make sure we get it done as soon as possible.

MR. KRAUT: I would just indicate that defense counsel provide to the Clerk of the Court the wire instructions, and

then all monies deposited under Mr. Cheema's name be wired back within one week.

THE COURT: Okay. I will do that.

MR. KRAUT: Is there anything that I or Mr. Cheema can do to cause the Court to have a belief that he would reasonably return with two -- when we have $2 million of -- and two houses being put up, where they would take people's houses that are friends of the family, co-workers, et cetera?

THE COURT: I certainly agree that you've present a very strong package. The concern again is the foreign ties and the sentencing exposure here and the strength of the evidence. So I've thought about it, if there are conditions, and I've concluded there aren't.

MR. KRAUT: Thank you.

MR. BURNETT: Nothing more from the government. Thank you.

THE COURT: All right. Thank you. Everyone stay well.

MR. SHERMAN: Thank you.

(Adjourned)