**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 7, 2023

**BY ECF AND EMAIL**

The Honorable John P. Cronan
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

**Re: *United States v. Christopher Burgos*, 22 Cr. 618 (JPC)**

Dear Judge Cronan:

The Government respectfully submits this letter in advance of the bail hearing in the above-captioned matter, which is scheduled for July 11, 2023. The Government requested this bail hearing after learning that the defendant, Christopher Burgos, had been arrested for threatening another man with a knife. The defendant has repeatedly lied to his Pretrial Services Officer about the circumstances of this arrest. Because there are no conditions or combination of conditions that will reasonably assure the safety of the community and the appearance of the defendant, his bail should be revoked and he should be detained.

## I. Background

On or about November 16, 2022, the defendant was arrested in connection with an indictment charging him with conspiring to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) & 846. As the Court is aware, the defendant is charged with conspiring with his co-defendants—Michael Habib, Surinder Singh Cheema, and Bhupinder Singh Virk—and others known and unknown, to traffic massive quantities of cocaine. The defendants are part of a large-scale drug trafficking organization that operates principally in the United States and Canada. The specific shipments of narcotics that are at issue in the Indictment are a series of cocaine deliveries that were made to a warehouse in New Jersey between March 18 and March 21, 2022. Over that roughly three-day period, there were approximately 400 kilograms of cocaine that were delivered to a warehouse, and where they were supposed to be packaged, uploaded onto a truck, and shipped elsewhere. Instead, those drugs were ultimately seized. Burgos exercised control over that warehouse and his role was to assist in coordinating the physical receipt and transfer of the narcotics.

At the defendant's initial appearance before Magistrate Judge Jennifer E. Willis on November 16, 2022, the Government sought detention and noted that detention was presumed mandatory given the nature of the narcotics charges against the defendant. Judge Willis found that

the presumption of mandatory detention had been rebutted and ordered the defendant released on conditions, which included GPS monitoring and a curfew. (Doc. No. 17). On February 14, 2023, this Court modified the defendant's bail conditions to remove the GPS monitoring and curfew conditions. (Doc. No. 64). All other defendants in this case have been detained since their arrests.

On June 21, 2023, shortly before midnight, the defendant was arrested by the New York City Police Department ("NYPD") in Brooklyn, New York. Officers arrived at the residence of the defendant's ex-girlfriend (the "Ex-Girlfriend") after her male friend ("Victim-1") called 911. Victim-1 told officers he was staying at the Ex-Girlfriend's residence when the defendant showed up, started yelling because Victim-1 was there, and then took out a long kitchen knife from the Ex-Girlfriend's kitchen and pointed it menacingly at Victim-1. *See* Ex. 1 (NYPD Complaint and Arrest Report).

The defendant was charged with the following offenses in Kings County Criminal Court: (1) Menacing in the Second Degree – Weapon other than Gun/Handgun, in violation of N.Y. Pen. L. § 120.14(01), an A Misdemeanor; (2) Menacing in the Third Degree, in violation of N.Y. Pen. L. § 120.15, a B Misdemeanor; and (3) Harassment in the Second Degree, Physical Contact, in violation of N.Y. Pen. L. § 240.26(01), a violation.

The defendant notified his Pretrial Services Officer of his arrest on June 22, 2023. On June 23, 2023, Pretrial Services notified the Government and defense counsel that the defendant had been arrested and that Pretrial Services was recommending no action be taken. On June 26, 2023, Pretrial Services submitted a No-Action Memo to the Court with respect to the defendant's arrest. In that Memo, Pretrial Services recounted the defendant's explanation of the arrest as follows:

> He explained he was visiting his ex-girlfriend, and a male friend of hers showed up unannounced and a verbal dispute between the defendant and the other male ensued, which led to the police being called, and resulted in the defendant being arrested.

No-Action Memo at 2.

Subsequently, on or about June 26, 2023, the Government obtained a copy of the NYPD Complaint and provided it to the Pretrial Services Officer. The Government emailed the Pretrial Services Officer to clarify whether the defendant said he showed up unannounced (as indicated in the NYPD Complaint) or whether Victim-1 showed up unannounced (as indicated in the Memo), and whether the defendant mentioned that he was accused of displaying a knife. The Pretrial Services Officer responded that, "The defendant failed to mention to me that he pulled out a knife. He presented to me that it was just a verbal altercation between him and the other male."

The Government subsequently spoke with the arresting officer ("Officer-1"), who said that all three parties—Victim-1, the Ex-Girlfriend, and the defendant—told the officers that the defendant had arrived at the Ex-Girlfriend's house unannounced and demanded she let him in. Victim-1 claimed the defendant pointed a knife at him; the defendant denied it; the Ex-Girlfriend said did not see a knife but everything happened so quickly that she could not be sure. Officers searched for a knife but did not find one in the house.

On June 27, 2023, the Government again sought clarification from Pretrial Services on whether the defendant in fact told Pretrial Services that Victim-1 showed up unannounced when the defendant was already at the Ex-Girlfriend's house, or whether that was a miscommunication that resulted in that misstatement appearing in the Memo. The Pretrial Services Officer responded on June 28, 2023, "I spoke to my defendant again yesterday and he reported the other male made false accusations against him. My defendant reported he was visiting his ex-girlfriend, and then the other male showed up unannounced, and started the altercation. My defendant reported he did not pull a knife out. He also told me that his ex-girlfriend corroborated this information to NYPD and told the officers she didn't have large kitchen knife in her residence. My defendant reported that the other male ran from the scene after calling the police and allegedly made false accusations against the defendant."

At the status conference held before the Court on June 28, 2023, the Government requested this bail hearing; the defendant's presence had been excused. After the status conference, the Government obtained copies of the body camera footage from three officers who responded to the arrest (Exs. 2-4), as well as the 911 caller audio (Exs. 5 & 6), which the Government is submitting with this letter brief. That evidence shows the following:

Two 911 calls were placed in short succession the night of June 21, 2023. On one, Victim-1, reports that he was staying with a friend at her house when her ex-boyfriend (the defendant) showed up and got "rowdy." Ex. 5. Victim-1 stated that the defendant then went to the kitchen and pulled out a knife. On the second 911 call, placed by a friend of the Ex-Girlfriend (the "Friend") at approximately the same time, the Friend said that while he was upstate that evening, the Ex-Girlfriend told him that her ex-boyfriend "Christopher" had shown up at her house and was "hitting her." Ex. 6.

On the body camera footage, the defendant, the Ex-Girlfriend, and Victim-1 are all clear that Victim-1, who was visiting from out of state, was at the Ex-Girlfriend's house when Burgos showed up unannounced and started yelling at Victim-1 and the Ex-Girlfriend because Burgos was upset Victim-1 was there.

Burgos first told the officers that he came over to the Ex-Girlfriend's house because he was worried about the Ex-Girlfriend because her mother was sick and the Ex-Girlfriend had stopped responding to his texts that evening. He came over, saw Victim-1 there, lost his temper, got "aggressive," and started yelling.

A few minutes later, when the defendant was questioned again outside the Ex-Girlfriend's presence, he added he was watching Ex-Girlfriend's online livestream video and saw another man on the livestream in her bedroom, in his boxers, pulling his pants up. The defendant got jealous, and wanted to yell at Victim-1 to tell him to leave the Ex-Girlfriend's house. Burgos asked the other man if he had a knife because he was holding his pants up when he came in; the other man said no but, according to Burgos, acted tough. Burgos asked the Ex-Girlfriend to tell Victim-1 to leave; she did; Victim-1 said he was going to call the police. Burgos appears agitated on the video, talking very quickly with the officers.

Victim-1 told officers that he was from out of state and that he was visiting the Ex-Girlfriend, his friend. While he was at her house, Burgos started knocking on the door. The Ex-Girlfriend panicked and did not want to open the door. Burgos then came in and started yelling and pushing her, upset that Victim-1 was there. Burgos went into the kitchen area, started searching through the drawers, pulled out a large steak knife, and pointed it at Victim-1. Burgos then said something to Victim-1 about "already going to jail," which Victim-1 interpreted as a threat.

Victim-1 then left the house, past Burgos, who allowed him to leave, and Victim-1 then called 911 from the street outside the house. Victim-1 asked officers if the Ex-Girlfriend was okay because Burgos was pushing her around. Victim-1 stayed outside the house until police arrived; officers told Burgos that Victim-1 was just outside. Victim-1 appears calm and composed on the body camera footage and indicated he would wait for Burgos to be arrested so he could go back inside since he was staying with the Ex-Girlfriend.

The Ex-Girlfriend told officers that Victim-1 was one of her friends from her livestream feed and came from out of state to visit her. While he was visiting, she started ignoring Burgos's texts. She then heard Burgos knocking on her door and calling her cellphone at the same time. She tried ignoring him and did not want to open the door for him, but ultimately opened the door when he would not go away. Burgos then started screaming at her and Victim-1.

While being interviewed in Burgos's presence, the Ex-Girlfriend told officers that she did not see a knife and did not think Burgos pulled a knife out. She also said at other points she that could not be sure given how quickly things unfolded. She said Burgos pulled out her cellphone from the kitchen drawer and threw it out the window, and that maybe Victim-1 mistook the phone for a knife. She added that Burgos kicked over her table while he was screaming at her. She said he did not touch her or Victim-1. She seemed upset, but not as agitated as Burgos.

Notably, after officers removed Burgos from the Ex-Girlfriend's house, the Ex-Girlfriend remained with one officer ("Officer-2"). While they were waiting inside, the Ex-Girlfriend effectively admitted to Officer-2, unprompted, that Burgos had a knife. She expressed surprise over the seriousness with which the police were taking the incident and stated, "Someone takes a knife out and puts the knife back, y'know what I mean?" (Ex. 3 at 11:00). Officer-2 responded, "The other guy felt threatened by the knife, that's why we're here. The knife displayed led to the call." The Ex-Girlfriend no longer disputed the presence of a knife, but downplayed it, saying, "It all happened so quickly, but it wasn't even crazy, it was like 30 seconds."

## II. Applicable Law

Under the Bail Reform Act, if a defendant on pretrial release commits a federal, state, or local crime, the Court may conduct a revocation hearing and must enter an order of revocation and detention if, after a hearing, the Court finds that: (1) there is probable cause to believe the defendant committed a federal, state, or local crime while on pretrial release; and (2) there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or the person is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(1)(A) & (2)(A)-(B).

In addition, where there is probable cause to believe that the crime the defendant committed while on pretrial release is a felony, there is a rebuttable presumption that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community.

## III. Discussion

Given the dangerous nature of the defendant's conduct while on pretrial release pending serious narcotics trafficking charges, and his repeated lies and obfuscations to his Pretrial Services Officer, the defendant's bail should be revoked.

### A. There is Probable Cause to Believe the Defendant Committed State and Federal Crimes

There is probable cause to believe the defendant committed both the state crimes that led to his arrest in Brooklyn and the separate crime of lying to his Pretrial Services Officer in violation of 18 U.S.C. § 1001.

With respect to the state crimes, the evidence from the night of the arrest makes it crystal clear—indeed, the Government would expect undisputed—that the defendant arrived at the Ex-Girlfriend's house unannounced, demanded to be let in, and, once inside, began yelling and screaming at the Ex-Girlfriend about Victim-1 being there and demanded that Victim-1 leave the house he was staying in. By the defendant's own admission on the body camera footage, he acted aggressively.

Victim-1 reported that the defendant pointed a large kitchen knife at him and threatened him, saying something like, I'm going to jail anyways. The defendant disputes this and denied having a knife at the time of his arrest. The Ex-Girlfriend initially said that she did not think the defendant pulled out a knife. But she backtracked when it was just her and Officer-2, and effectively admitted that Burgos had a knife to Officer-2 when she asked what happens when "someone takes a knife out and puts the knife back." *See supra* at 4.

While officers were unable to locate a knife at the scene, Victim-1, who is from the West Coast, did not appear to have any prior relationship with Burgos, appeared calm on the body worn camera, and would have no apparent reason to: (1) know that Burgos was already charged with another crime such that he could have made up Burgos's statement that he was already going to jail; (2) mistake a cellphone for a knife; or (3) call 911 immediately after leaving and report that he saw a knife. Given this and the Ex-Girlfriend's statement, the evidence suggests that Victim-1 is the more believable witness here.

In any event, the evidence suggests that knife or no knife, this was more than the "verbal dispute" that Burgos reported to his Pretrial Services Officer. When officers arrived on the scene, one of the first things Victim-1 asked is if the Ex-Girlfriend was okay because Burgos was pushing her around. The Ex-Girlfriend denied being physically assaulted by Burgos, but stated that he was screaming at her and Victim-1, threw her cellphone out of her open window, and kicked over her

table. Moreover, the Friend who called from "upstate" told the 911 operator that the Ex-Girlfriend told him the defendant came over and was hitting her.

On these facts, there is probable cause to believe that Burgos committed the state crimes of Menacing in the Second and Third Degrees. Menacing in the Second Degree is committed when the defendant "intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying a deadly weapon, dangerous instrument or what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm." N.Y. Pen. L. § 120.14(1). Menacing in the Third Degree is committed when, "by physical menace, [the defendant] intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury." N.Y. Pen. L. § 120.15.

In addition, given the defendant's repeated misstatements and obfuscations to the Pretrial Services Officer, there is also probable cause to believe that Burgos committed the federal crime of making false statements to a judicial officer, in violation of 18 U.S.C. § 1001. The clearest lie is that, on two separate occasions, Burgos falsely conveyed the nature of the crime, telling his Pretrial Services Officer that he was *already* at the Ex-Girlfriend's house when Victim-1 showed up unannounced and that Victim-1 started the altercation before later calling the police. But on the body camera footage, the defendant, Victim-1, and the Ex-Girlfriend are all clear that Victim-1 was already at the house when the defendant showed up announced and started screaming at the other two. By falsely claiming that Victim-1 was the instigator who arrived at the house, Burgos sought to minimize his conduct, likely to avoid consequences to his federal pretrial release.[1]

In addition to this obvious and repeated lie, Burgos also appears to have lied to his Pretrial Services Officer by: (1) characterizing the dispute as a "verbal" dispute; (2) denying that he had a knife; and (3) saying that Victim-1 ran from the scene after making false accusations. Again, these lies, while in some instances disputed (the knife) or more tangential (whether Victim-1 fled from the scene), served Burgos's purpose of attempting to minimize his conduct to Pretrial Services to avoid consequences to his federal pretrial release.

### B. The Defendant Cannot Overcome the Presumption of Detention

Because lying to a federal officer in violation of 18 U.S.C. § 1001 is a felony, there is a presumption of detention. Burgos cannot rebut the presumption; the weight of the factors under 18 U.S.C. 3142(g) support detention.

*First*, the nature and the circumstances of the charged offenses—trafficking hundreds of kilograms of cocaine—are extremely serious and dangerousness. 18 U.S.C. § 3142(g)(1). As the Government argued to the Court at the bail hearings for defendants Cheema and Virk, law enforcement, through physical and electronic surveillance of Signal group chats, observed the defendant and his co-conspirators coordinating the receipt and delivery of multiple shipments of hundred-kilogram quantities of cocaine. Defendant Burgos was part of those Signal group chats

---

[1] Indeed, on the bodycamera footage, Burgos mentions that he is on federal pretrial release, and Officer-1 told AUSA Shahabian that Burgos expressed concern for how this arrest would affect his federal pretrial release.

and also had physical control of the warehouse in New Jersey. After law enforcement seized the kilograms of cocaine—which have a street value of just under approximately $10 million—recriminations started in the group chats, with co-conspirators threatening each other about who was responsible for the lost cocaine. As the Court knows, defendant Virk was arrested with several unregistered "ghost" guns. While Burgos was not arrested in possession of firearms and the Government is not currently aware of his participation in any of the post-seizure recriminations, the very nature of the offense—millions of dollars of narcotics trafficking on behalf of a DTO whose members are known to threaten retaliation and have access to firearms—shows the dangerousness of the charged offense. Indeed it is notable, both for this factor and the defendant's conduct on pretrial release, that Burgos is the only defendant not currently detained in this case.

*Second*, the weight of the evidence is strong. *See* 18 U.S.C. § 3142(g)(2). As was the case for defendants Virk and Cheema, the Government identified Burgos a member of the DTO through the phone numbers used in the Signal chats, through execution of search warrants on iCloud accounts and physical cellphones, through recorded conversations involving Burgos where he discusses the seizure of the cocaine, and through physical surveillance and witness testimony.

*Third*, and perhaps most importantly for this bail revocation hearing, the history and characteristics of the defendant, including the danger the defendant poses to other persons and the community, weigh in favor of detention. *See* 18 U.S.C. § 3142(g)(3)-(4). The behavior of the defendant while on pretrial release is inexcusable. He prevailed on his argument for pretrial release over the Government's objection, and has attended multiple conferences in this case walking through the front doors of 500 Pearl Street while his co-conspirators arrive transported by the Marshals' Service. In February, the Court agreed to lower his bail conditions and remove his GPS bracelet and curfew condition. He is facing a mandatory minimum sentence of 10 years' in prison, and given the sheer quantity of narcotics involved, a similarly high potential Guidelines range.

Notwithstanding that, two weeks ago the defendant decided to: (1) show up at his Ex-Girlfriend's house in the middle of the night, unannounced; (2) scream at her and her friend because he was jealous she had another man there; (3) threaten that man with a knife, while having the presence of mind to note he was already going to jail for the charged conduct; and, perhaps most bafflingly, (4) repeatedly lie to his Pretrial Services Officer about the circumstances of his arrest.

In connection with its investigation into this arrest, the Government has also learned that this is not the first time the defendant has been accused of harassing or assaulting former romantic partners. In June 2022, a different ex-girlfriend of the defendant (the "Second Ex-Girlfriend") filed a complaint with the NYPD for harassment in violation of an order of protection she had obtained against the defendant. Ex. 7. That ex-girlfriend reported to the NYPD that the defendant has access to firearms and had previously seen a photo of him holding a firearm. [redacted] Ex. 8. In April 2022, the Second Ex-Girlfriend complained to the NYPD that the defendant threatened to post intimate pictures of her to social media without her consent and that the defendant threatened her by texting her "see what

happens" if she continued to talk to the police. Ex. 9. While the Government does not currently know the circumstances of the resolution of those complaints, this history adds to the picture the defendant himself painted the night he showed up at the Ex-Girlfriend's house, while on pretrial release, to confront her and Victim-1.

In short, the defendant is a danger to the community and cannot be trusted to comply with the conditions of his release. Because there are no conditions or combination of conditions that will reasonably assure the appearance of the defendant and the safety of the community, the Government respectfully requests that the defendant's bail be revoked and that he be ordered detained.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/_________________________
Thomas Burnett / Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-1064 / -1046

cc: James Froccaro, Jr., Esq. (by ECF and email)

Enclosures